FILED IN CHAMBERS
U.S.D.C. Atlanta

JUL 1 7 2008

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IP CO., LLC and SIPCO, LLC,

        Plaintiffs,

v.

CELLNET TECHNOLOGY, INC.,
TROPOS NETWORKS, INC., HUNT
TECHNOLOGIES, LLC, and B&L
TECH CO., INC.,

        Defendants.

CIVIL ACTION NO.

1:06-CV-03048-JEC

## O R D E R   &   O P I N I O N

This case is presently before the Court on plaintiff SIPCO's Motion for Partial Summary Judgment Against Defendant B&L Tech Company [231], plaintiffs' Renewed Motion for Partial Summary Judgment on defendant Hunt Technologies' Reversion Claim [235], defendants' Motion to Amend Scheduling Order [244], defendant B&L Tech Company's Motion to Strike [252], defendant B&L Tech Company's Motion for Continuance and Motion to Stay [260], and defendants' Motion for Protective Order [288].

The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff SIPCO's Motion for Partial Summary Judgment [231] should be **DENIED**, plaintiffs' Renewed Motion for Partial Summary Judgment on Hunt

Technologies' Reversion Claim [235] should be **GRANTED**, defendants' Motion to Amend Scheduling Order [244] should be **GRANTED**, defendant B&L Tech Company's Motion to Strike [252] should be **DENIED as moot,** defendant B&L Tech Company's Motion for Continuance and Stay [260] should be **DENIED as moot,** and defendants' Motion for Protective Order [288] should be **GRANTED as unopposed.**

## BACKGROUND

This lawsuit involves a series of interrelated patent licensing and assignment agreements between plaintiff SIPCO, LLC ("SIPCO") and defendant B&L Tech Company ("B&L").[1] (Amended Compl. [151] at 3-11.) During the late 1990's and early 2000's, B&L developed and obtained a portfolio of patents related to technology involving wireless mesh network systems. (B&L's Response in Opp'n to Pl.'s Mot. for Partial Summ. J. ("B&L's Response")[251] at 5.) The technology had various applications both within and outside of the utility industry. (*Id.* at 6.)

In November 2003, three individuals associated with B&L formed the separate company SIPCO as part of a restructuring of B&L. (*Id.*) On March 31, 2004, SIPCO and B&L executed an "Intellectual Property

---

[1] B&L was formerly known as StatSignal Systems, Inc. ("SSI"). (SIPCO's Statement of Material Facts ("SSMF") [231] at ¶ 1.) For consistency, and to avoid confusion, the Court refers to the former SSI as B&L.

AO 72A
(Rev.8/82)

License and Assignment Agreement ("the Licensing Agreement"). (SIPCO's Statement of Material Facts ("SSMF") [231] at ¶ 1.) Pursuant to the Licensing Agreement, B&L licensed and assigned certain patents to SIPCO in return for royalty payments. (B&L's Response [251] at 6.) The Licensing Agreement granted SIPCO rights to the patents outside the utility industry, while preserving B&L's rights to the patents within the utility industry. (*Id.*)

In connection with the Licensing Agreement, B&L and SIPCO executed a "Notification of Sale and Right of First Offer Agreement" ("the Notification Agreement"). (SSMF [231] at ¶ 2.) The Notification Agreement required B&L to give SIPCO notice of B&L's intent to sell or transfer the licensed patents, either alone or in connection with a sale of B&L's business, to a third party. (Notification Agreement at ¶ 2, attached to SIPCO's Appx. of Documents [231] at Tab A.) Upon receiving notice of an intended sale, the Agreement gave SIPCO the right to purchase the patents on the same terms as offered to the proposed third-party buyer. (*Id.*)

Paragraph 2 of the Notification Agreement carved out an exception to the notification and right of first offer requirements in the event of a sale to third-party Landis & Gyr, Inc. ("L&G"). (*Id.*) Specifically, Paragraph 2 permitted B&L to sell or transfer the licensed patents to L&G, or in certain specified situations to an affiliate of L&G, without providing notice or a right of first offer

3

to SIPCO. (*Id.*) The reason that the parties included the L&G exception is that B&L was already negotiating an asset sale to L&G when the parties executed the March 31, 2004 Agreements. (SSMF [231] at ¶ 3; Def.'s Response to PSMF [251-2] at ¶ 3.) However, those negotiations did not ultimately result in a sale to L&G in 2004.

In November 2005, SIPCO and B&L executed a Release Agreement ("the 2005 Release") modifying the terms of the Licensing and Notification Agreements. (2005 Release, attached to SIPCO's Appx. of Documents [231] at Tab B.) Several circumstances led to the 2005 Release. (B&L's Response [251] at 8.) First, SIPCO wanted to reduce its royalty and payment obligations under the Licensing Agreement. (*Id.*) Second, B&L had at this point entered into negotiations to sell its assets, including the licensed patents, to third-party Motorola. (*Id.*) B&L therefore wanted to be relieved of its obligations under the Notification Agreement in the event of B&L's sale of its assets to any third party, including Motorola. (*Id.*)

The 2005 Release reflects the parties' intent on both of these issues. (2005 Release at ¶¶ 3 and 10.) The Release contains a term reducing and capping SIPCO's royalties. (*Id.* at ¶ 3.) It also contains a term providing that B&L's assets "shall be assignable by [B&L], without prior authorization of [SIPCO], to an entity that acquires at least substantially all of the assets of [B&L]." (*Id.* at ¶ 10.4.)

4

On July 31, 2006, B&L entered into an Asset Purchase Agreement with Hunt Technologies, Inc. ("Hunt"), an affiliate of L&G. (SSMF [231] at ¶ 5; B&L's Response to SSMF [251-2] at ¶ 5.) Pursuant to the terms of the Asset Purchase Agreement, Hunt obtained substantially all of B&L's assets, including the patents that had been licensed to SIPCO under the Licensing Agreement.[2] (B&L's Response to SSMF [251-2] at ¶ 5.) B&L did not give SIPCO notice of the Hunt transaction. (Id. at ¶ 6.) Neither did B&L give SIPCO the opportunity to purchase the licensed patents on the same terms as offered to Hunt. (Id.)

SIPCO became aware of the Hunt transaction in October 2006. (SIPCO's Br. in Supp. of Mot. for Partial Summ. J. ("SIPCO's Br.") [231] at 8.) SIPCO believed that the transaction violated its rights to notice and first offer under the Notification Agreement. (Amended Compl. [151] at Count II.) It filed this lawsuit, along with a motion for preliminary injunction, asserting breach of contract claims against B&L and Hunt. (Id.) In addition, SIPCO asserted related patent claims against defendants Cellnet Technology, Inc.

---

[2] SIPCO claims that the Asset Purchase Agreement did not involve "substantially all" of B&L's assets. (SIPCO's Mot. for Partial Summ. J. [231] at 14-15, n. 26.) Neither party has addressed this issue sufficiently to rule on it as a matter of law. For purposes of this motion, the Court construes the facts most favorably to B&L, and assumes that B&L conveyed substantially all of its assets to Hunt in the 2006 Asset Purchase Agreement.

5

("Cellnet") and Tropos Networks, Inc. ("Tropos"). (*Id.* at Count I.) Defendants asserted various counterclaims, including a claim by Hunt that SIPCO's patent claims had triggered a reversion clause in the Licensing Agreement. (Hunt's Counterclaim [164] at 17-21.)

SIPCO has now filed a motion for partial summary judgment on its breach of contract claim, and both plaintiffs have filed a motion for summary judgment on Hunt's reversion claim. (SIPCO's Mot. for Partial Summ. J. [231] and Pls.' Mot. for Partial Summ. J. on Reversion Claim [235].) Those motions, as well as a number of related motions submitted by B&L and Hunt, are presently before the Court. Also before the Court are various discovery and scheduling disputes outlined by the parties in a recent joint status report. (Status Report [310].)

**DISCUSSION**

I. **Plaintiffs' Summary Judgment Motions**

   A. **Summary Judgment Standard**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue

AO 72A
(Rev.8/82)

is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. (*Id.* at 249-50.)

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. (*Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).)

The movant bears the initial responsibility of asserting the basis for his motion. (*Id.* at 323.) However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." (*Id.* at 325.) After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'"

AO 72A
(Rev.8/82)

(*Id.* at 324.) While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

**B.  SIPCO's Motion for Summary Judgment as to B&L's Breach of the Notification Agreement**

### 1.  Georgia contract law governs the Court's interpretation of the Notification Agreement.

Paragraph 5(f) of the Notification Agreement provides that: "This Agreement shall be construed under and governed by the laws of the State of Georgia, without regard to any conflict of law principles." (Notification Agreement at ¶ 5(f).) The Court thus applies Georgia contract law to interpret the Agreement. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state.") and *Kinnick v. Textron Fin. Corp.*, 205 Ga. App. 429, 430, 422 S.E. 2d 303 (1992)(Georgia courts "will normally enforce a contractual choice of law clause" absent a contrary public policy).

Under Georgia law, the construction of a contract generally is a question of law for the Court. O.C.G.A. § 13-2-1. *See also Sofran*

AO 72A
(Rev.8/82)

*Peachtree City, LLC v. Peachtree City Holdings, LLC,* 250 Ga. App. 46, 550 S.E. 2d 429, 430 (2001). "The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3. In applying this overarching rule, the Court is guided by additional statutory rules of contract construction. *See* O.C.G.A. § 13-2-2(1)-(9). Most important for the purposes of the present motions are two familiar maxims: (1) words in a contract "generally bear their usual and common" meaning; and (2)"the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(2) and (4).

> ### 2.   The Hunt transaction did not violate the Notification Agreement.

Applying these two fundamental principles, SIPCO clearly is not entitled to summary judgment. Paragraph 2, the operative provision of the Notification Agreement, states that:

> [B&L] shall not (i) sell its business to any party *other than Landis & Gyr, Inc. or its successors in interest or its affiliates*, whether through a sale of all or substantially all of its assets, or through a merger, or (ii) sell, transfer, convey or assign to any party other than Landis & Gyr, Inc. any of the patents or patent applications that are subject to the license granted to [SIPCO] pursuant to the [Licensing Agreement].

(Notification Agreement at ¶ 2 (emphasis added).) Construing the facts in favor of B&L, the Hunt transaction involved a sale of substantially all of B&L's assets to Hunt. (B&L's Response [251] at 10.) The parties do not dispute that Hunt is an affiliate of L&G.

9

(*Id.*)  Consequently, the Hunt transaction was exempt from the terms of the Notification Agreement under ¶ 2(i).

SIPCO concedes that the Hunt transaction was expressly permitted by ¶ 2(i).  (SIPCO's Br. [231] at 15-18.)  However, SIPCO argues that the transaction was simultaneously prohibited by ¶ 2(ii).  (*Id.*)  According to SIPCO, B&L's sale of the licensed patents to "any party other than [L&G]" was literally restricted by ¶ 2(ii), regardless of whether the transaction was part of a larger sale of substantially all of B&L's assets to an affiliate of L&G.  (*Id.*)

SIPCO's argument makes sense only if the Court reads ¶ 2(ii) in isolation from ¶ 2(i).[3]  As discussed above, Georgia law requires the Court to consider "the whole contract . . . in arriving at the construction of any part."  O.C.G.A. § 13-2-2(4).  Applying that rule, and reading ¶ 2(ii) together with ¶ 2(i), the Notification Agreement plainly exempts two types of transactions from its terms: (1) a sale of substantially all of B&L's assets, including the

---

[3]    SIPCO's attempt to reconcile ¶¶ 2(i) and 2(ii) by posing several hypotheticals in which a sale of "substantially all" of B&L's assets could potentially exclude a sale of the licensed patents is unpersuasive.   (SIPCO's  Br.  [231]  at  15-18.)   Giving the term "substantially all" its "usual and common meaning" the Court presumes that a sale of "substantially all" of B&L's assets would necessarily involve a sale of the licensed patents.  *See* O.C.G.A. § 13-2-2(2). In fact, it is undisputed that the licensed patents constituted a significant percentage of B&L's assets at the time of the Hunt transaction.   (*See* B&L's Response [251] at 19-20 and SIPCO's Br. [231] at 14-15.)   SIPCO's proposed construction of "substantially all" would therefore be particularly unreasonable in this case.

AO 72A
(Rev.8/82)

licensed patents, to L&G or one of its affiliates; or (2) a sale only of the licensed patents to L&G. The Hunt transaction falls within the first category of exempted transactions. Accordingly, SIPCO's motion for summary judgment [231] should be **DENIED**.

### 3. The Notification Agreement was modified and superseded by the 2005 Release.

Even assuming the Hunt transaction violated the terms of the Notification Agreement, SIPCO still is not entitled to summary judgment. In November 2005, the parties signed a Release Agreement, which substantially modified and superseded the agreements that the parties executed in 2004, including the Notification Agreement. (2005 Release, attached to SIPCO's Appx. of Documents [231] at Tab B.) The 2005 Release relieved SIPCO of some of its royalty and payment obligations under the Licensing Agreement. (*Id.* at Ex. 1, ¶ 3.) In return, the Release granted certain rights back to B&L, including the right to assign the patents that were the subject of the parties' various agreements "without prior authorization of [SIPCO], to an entity that acquires at least substantially all of the assets of [B&L]." (*Id.* at ¶ 10.4.) Regardless of the terms of the Notification Agreement, the Hunt transaction was expressly permitted by ¶ 10.4 of the 2005 Release.

SIPCO's argument that ¶ 10.4 does not apply to the licensed patents is unpersuasive. The relevant language of ¶ 10.4 reads as

11

follows:

> This Agreement shall be binding upon and inure to the benefit
> of the successors and permitted assigns of the parties hereto,
> and this Agreement shall be assignable by [B&L], without prior
> authorization of [SIPCO], to an entity that acquires at least
> substantially all of the assets of [B&L].

(*Id.*) According to SIPCO, "[t]his Agreement" refers solely to the

2005 Release itself. (SIPCO's Br. [231] at 11-13.) However, the

term "agreement" is defined in the 2005 Release to include "all

Exhibits attached to this Agreement." (2005 Release at ¶ 1.1.) Both

the Licensing Agreement and the Notification Agreement are expressly

listed in Exhibit A to the Release. (*Id.* at Ex. A.)

Moreover, SIPCO does not persuasively counter the evidence

presented by B&L that one of B&L's primary objectives in executing

the 2005 Release was to be relieved of its obligations under the

Notification Agreement. (B&L's Br. [251] at 8.) When the parties

entered into the Release, B&L was in negotiations to sell

substantially all of its assets to Motorola. (*Id.*) B&L therefore

wanted to be relieved of its notification obligations to SIPCO in the

event its negotiations with Motorola were successful. (*Id.*) B&L's

Vice President David Belitz, who negotiated the Release on behalf of

B&L, specifically communicated B&L's intent on this subject to SIPCO

Chairman Oliver Lee. (*Id.*) According to B&L, both parties

understood that the terms of the Notification Agreement had been

modified and superseded by ¶ 10.4 of the Release. (*Id.* at 16.)

AO 72A
(Rev.8/82)

Both the language of the 2005 Release, and the record evidence concerning its execution, support the conclusion that the Release relieved B&L of its obligations under the Notification Agreement in the event of a sale of "substantially all" of B&L's assets.[4] For this additional reason, SIPCO's motion for summary judgment [231] should be **DENIED**.[5]

### C. Plaintiffs' Motion for Summary Judgment as to Hunt's Reversion Claim

Plaintiffs have also filed a motion for summary judgment as to Hunt's counterclaim for reversion. (Pls.' Mot. for Summ. J. on Reversion Claim [235].) Hunt's reversion claim is based on § 2.2 of

---

[4] Pursuant to ¶ 10.5 of the 2005 Release, the terms of the Release supersede any conflicting provisions in the parties' previous agreements, including the Notification Agreement. (2005 Release at ¶ 10.5.)

[5] In addition to its response, B&L filed a motion to continue or stay SIPCO's motion for summary judgment pending additional discovery on various affirmative defenses. (B&L's Mot. to Continue or Stay [260].) The Court having denied SIPCO's motion for summary judgment on the merits, B&L's motion to continue or stay [260] is **DENIED as moot**.

B&L also filed a motion to strike the fourth declaration of Oliver Lee, submitted by SIPCO in support of its motion for summary judgment. (B&L's Mot. to Strike [252].) According to B&L, the Lee Declaration is improperly based on speculative statements and legal conclusions. (*Id.*) The Court does not agree with B&L's characterization of Lee's statements. Nevertheless, the Lee Declaration, which was solely directed to B&L's previously asserted waiver defense, is not material to the Court's decision to deny summary judgment. Accordingly, B&L's motion to strike [252] is also **DENIED as moot**.

AO 72A
(Rev.8/82)

the Licensing Agreement, which provides that:

  (a)  [SIPCO] represents and warrants to [B&L] that none of the [assigned patents] has any material relevance for use in the Utility Field of Use.

  (b)  [SIPCO] shall obtain [B&L's] prior written consent before commencing suit for any infringement of the Assigned Patents within the Utility Field of Use.

  (c)  In the event [SIPCO] fails to comply with Paragraph 2.2(b) above, [SIPCO] shall, and subject to such non-compliance [SIPCO] does hereby, transfer, convey and assign to [B&L] all of its rights, title and interests in and to any patent or patent application included within the Assigned Patents that [B&L] reasonably determines to have material relevance to the Utility Field of Use.

(Licensing Agreement [251-7] at ¶ 2.2; Hunt's Counterclaim [164] at 18-19.)  Hunt contends that the patent infringement claims that plaintiffs asserted against defendant Cellnet in this litigation triggered a reversion under ¶ 2.2(b).[6]  (Hunt's Counterclaim [164] at 20-21.)

     To resolve plaintiffs' motion for summary judgment on the reversion claim, the Court must determine whether plaintiffs' claims against Cellnet allege infringement of patents within the "Utility

_____

     [6]. Following the B&L-Hunt asset sale, Hunt succeeded to B&L's rights under the Licensing Agreement.  (Hunt's Counterclaim [164] at 19.)

14

Field of Use."[7]  Plaintiffs originally moved for summary judgment on the reversion claim on September 7, 2007. (Pls.' Mot. for Summ. J. [159].)   Hunt opposed the motion, arguing that it was not yet possible to determine whether plaintiffs' claims fell within the Utility Field of Use because plaintiffs had not identified which Cellnet products were allegedly infringing.   (Hunt's Response in Opp'n to Pls.' Mot. for Summ. J. [180].)  The Court agreed, noting that the submission of plaintiffs' Rule 4.1 Infringement Contentions would be helpful in identifying the allegedly infringing products.

---

[7]  The Licensing Agreement defines the relevant terms as follows:

(a)  "Field of Use" means applications or uses other than applications within the Utility Industry (such excepted applications and uses being referred to herein as the "Utility Field of Use"), with respect to which [B&L] will be granting an exclusive license to [L&G] pursuant to an agreement containing a grant provision in the form attached here as Exhibit E (the "L&G License").

(b)  "Utility Industry" means the industry in which applications permitting or supporting the generation, distribution or transmission of electricity, water or gas are used.   For the purposes of clarity and without limiting the generality of the foregoing, it is agreed that applications that may involve a utility but are unconnected to a) the generation, distribution or transmission of electricity, water or gas, or b) the measurement, monitoring, management or control of electricity, water or gas, are not within the scope of "Utility Industry."

(Licensing Agreement at ¶ 1.1.)

AO 72A
(Rev.8/82)

(Order [220]). The Court thus denied plaintiffs' motion for summary judgment without prejudice and ordered plaintiffs to submit their infringement contentions by January 22, 2008. (*Id.*)

Pursuant to the Court's Order, plaintiffs have now submitted their infringement contentions against Cellnet. In their contentions, plaintiffs have carefully limited their claims against Cellnet to the use of Patent No. 7,103,511 (the "'511 Patent') in a wireless broadband internet project provided by Cellnet to the City of Madison, Wisconsin (the "MadCity Project"). (Pls.' Infringement Contentions [236-2].) The parties agree that plaintiffs' claims related to the MadCity Project are not within the Utility Field of Use and therefore do not trigger the reversion clause. (*See generally* Hunt's Response in Opp'n to Pls.' Mot. for Summ. J. on Reversion Claim ("Hunt's Response") [246].) In fact, Hunt has agreed to dismiss its reversion claim as long as plaintiffs do not amend their infringement contentions to assert claims beyond the MadCity Project. (*Id.* at 13.)

Nevertheless, Hunt proposes that the Court keep the reversion claim in the case through the end of discovery in case plaintiffs attempt to amend their contentions to encompass additional claims that are potentially within the Utility Field of Use. (*Id.*) Hunt's proposal is based on plaintiffs' statement reserving the right to amend their contentions to include any projects similar to the

16

MadCity Project that may be revealed in discovery. (Pls.' Br. in Supp. of Mot. for Summ. J. on Reversion Claim ("Pls.' Br.") [235-2] at 2.) Plaintiffs explain that they limited their contentions to the MadCity Project in reliance upon Cellnet's representation that MadCity was the only project outside of the Utility Field of Use in which Cellnet has been involved. (*Id.*) Plaintiffs reserve the right to amend their contentions only to the extent that Cellnet's representation proves in discovery to be false. (*Id.*)

The parties have been engaged in discovery for nearly five months since plaintiffs filed their motion, yet plaintiffs have not moved to amend their infringement contentions. Moreover, based on plaintiffs' reservation of rights, any motion to amend would only involve projects similar to the MadCity Project, which presumably would not trigger the reversion clause. Accordingly, the Court does not find it necessary to leave the reversion claim in the case until the close of discovery. The parties agree that plaintiffs' claims, as defined in their infringement contentions, do not trigger the reversion clause under ¶ 2.2(b) of the Licensing Agreement. Accordingly, the Court **GRANTS** plaintiffs' motion for summary judgment on Hunt's reversion claim [235].

Having granted plaintiffs' motion, the Court takes this opportunity to clarify one point. Plaintiffs have hinted that they might seek to amend their contentions once the Court provides

17

guidance as to "the proper scope of the Utility Field of Use." (Infringement Contentions [236-2] at 5.) It is unclear exactly what guidance plaintiffs are expecting to receive. The Court cannot delineate the precise boundaries of the term "Utility Field of Use" in a vacuum, but only in the context of a dispute about whether a particular claim falls within or outside of the term. The MadCity Project, and similar projects involving wireless broadband internet systems, indisputably are not within the "Utility Field of Use." However, if plaintiffs amend their contentions to include claims that are closer to the line, the Court would expect Hunt to respond with a motion to reassert its reversion claim, which motion would likely be granted.

In short, if plaintiffs amend their infringement contentions to include claims that are even arguably within the "Utility Field of Use," they do so at their own peril. The Court does not intend to provide additional guidance on the term "Utility Field of Use" unless and until it is presented with an actual dispute concerning whether a particular claim falls within the definition of that term.

## II.  **Defendants' Motion to Amend Scheduling Order**

As set forth in the July 9, 2007 Scheduling Order, discovery in this case commenced on September 24, 2007 and was scheduled to close on February 8, 2008. (B&L's Mot. to Amend Scheduling Order [244] at 1.)  However, the parties were unable to complete much of the

18

document discovery until a protective order was entered by the Court on December 21, 2007. (*Id.* at 2.) In a December 26, 2007 Order, the Court recognized that discovery had been delayed, and indicated that the parties could seek an extension. (Order [220].) In February 2008, B&L filed a motion to amend the scheduling order to extend fact discovery by ninety days through May 9, 2008. (B&L's Mot. to Amend Scheduling Order [244].)

Plaintiffs essentially agreed to B&L's requested extension, and the Court was prepared to grant the motion. However, the parties have since filed a joint status report requesting additional extensions and raising various discovery disputes. (Joint Status Report [310].) Apparently, the parties have been overwhelmed by the volume of documents produced in this case, and by the requirements of the protective order governing the production of those documents. (*Id.* at 2-3.) As of May 15, 2008, the parties had exchanged hundreds of thousands of pages of documents, but still had to take approximately 15-20 additional depositions and complete privilege logs and confidentiality designations. (*Id.* at 3-4.)

Based on the various activities that remained to be completed as of May 15, 2008, the Court **GRANTS** B&L's motion to amend the scheduling order [244] and imposes the following deadlines, generally agreed to by the parties in the joint status report:

19

(1) Fact discovery should be completed by August 8, 2008.

(2) Dispositive motions are due twenty (20) days after the close of fact discovery, on August 29, 2008, with the time frame for responses and replies to be governed by the local rules.

(3) Disclosure of expert witnesses should be completed by the close of fact discovery, on August 8, 2008, with the exchange of expert witness reports to occur thirty (30) days after the disclosure of expert witnesses, by September 8, 2008.

(4) Exchange of expert witness rebuttal reports and opening of expert witness discovery should occur twenty (20) days after the exchange of expert witness reports, by September 29, 2008 and expert witness discovery will close on October 20, 2008.

(5) The Proposed Consolidated Pre-Trial Order should be submitted within twenty (20) days after the Court rules on any dispositive motions.[8]

In addition to the need for the above scheduling extensions, defendants raise issues in the status report concerning: (1) plaintiffs' allegedly improper confidentiality designations; and (2) the lack of a source designation on the documents produced by plaintiffs. As to the confidentiality designations, defendants contend that plaintiffs have overused the "highly confidential" category.[9] (*Id.* at 11.) They seek a stay in discovery to obtain a

---

[8] The parties requested in the status report that the date for submitting privilege logs be extended to May 30, 2008. (Status Report [310] at 9.) The Court assumes the parties will have exchanged privilege logs by the time this Order is issued.

[9] Under the governing protective order, documents that are designated "highly confidential" can only be viewed by the attorneys.

verification from plaintiffs that each of the documents produced by plaintiffs has been properly designated confidential or highly confidential. (*Id.*)

There is no reason to believe that plaintiffs have exercised bad faith in designating documents as confidential or highly confidential under the protective order. Apparently plaintiffs have been no more liberal with their use of the highly confidential designation than defendants. (Joint Status Report [310] at 18.) Moreover, defendants concede that plaintiffs have been responsive to their requests to change the designation of particular documents, and have voluntarily undertaken a redesignation of all the documents on a rolling basis. (*Id.* at 12.)

Fact discovery in this case has already been extended by more than four months. The additional delay proposed by defendants is not warranted or desirable. Accordingly, the Court **DENIES** defendants' request for a stay in discovery and an order requiring plaintiffs to provide a certification that they have properly designated their documents. If it turns out that plaintiffs have improperly designated documents in bad faith and in violation of the terms of the protective order, plaintiffs will be subject to sanctions.

---

A highly confidential designation thus limits the attorneys' ability to review a particular document with corporate representatives in preparation for depositions or trial.

AO 72A
(Rev.8/82)

The Court does understand that defendants have had problems with the redesignations that plaintiffs have provided as of this date. According to defendants, plaintiffs' declassification has consisted solely of "file overlays" and other information with bates ranges of documents to be redesignated. (*Id.* at 13.) Apparently, defendants have had difficulty applying the overlay files to the data previously produced by plaintiffs because the overlays do not easily integrate with defendants' electronic document database. (*Id.*) To remedy this problem, the Court **ORDERS** plaintiffs to produce images for the redesignated documents, which images should contain a reclassified confidentiality designation. Defendants requested replacement images on May 1, 2008. If plaintiffs have not already complied with this request, they should do so **within ten (10) days** of this Order.

With regard to the lack of source designation, defendants complain that plaintiffs SIPCO and IPCO produced their documents together as "SIPCO" documents, without indicating which documents were in the possession of SIPCO and which were in the possession of IPCO. (*Id.* at 15-17.) Plaintiffs point out that the vast majority of the documents they produced were in the joint possession of SIPCO and IPCO, and that they complied with Rule 34 by producing the documents as they are kept in the ordinary course of business. (Joint Status Report [310] at 23.) In addition, plaintiffs have since given defendants bates numbers for those documents that were in

22

IPCO's sole possession and those documents that were in SIPCO's sole possession. (*Id.*) The Court does not see how plaintiffs can more accurately identify the source of their documents. The Court thus **DENIES** defendants' request that SIPCO and IPCO further designate which documents are held in the possession of which company.

### CONCLUSION

For the foregoing reasons, the Court finds that plaintiff SIPCO's Motion for Partial Summary Judgment [231] should be **DENIED**, plaintiffs' Renewed Motion for Partial Summary Judgment on Reversion Claim [235] should be **GRANTED**, defendants' Motion to Amend Scheduling Order [244] should be **GRANTED**, defendant B&L Tech Company's Motion to Strike [252] should be **DENIED**, defendant B&L Tech Company's Motion for Continuance and Stay [260] should be **DENIED as moot**, and defendants' Motion for Protective Order [288] should be **GRANTED as unopposed.**

In summary, the Court imposes the following deadlines:

(1)   Fact discovery should be completed by **August 8, 2008.**

(2)   Dispositive motions are due twenty (20) days after the close of fact discovery, on **August 29, 2008,** with the time frame for responses and replies to be governed by the local rules.

(3)   Disclosure of expert witnesses should be completed by the close of fact discovery, on **August 8, 2008,** with the exchange of expert witness reports to occur thirty (30) days after the disclosure of expert witnesses, by **September 8, 2008.**

23

(4)  Exchange of expert witness rebuttal reports and opening of expert witness discovery should occur twenty (20) days after the exchange of expert witness reports, by **September 29, 2008** and expert witness discovery will close on **October 20, 2008**.

(5)  The Proposed Consolidated Pre-Trial Order should be submitted **within twenty (20) days** after the Court rules on any dispositive motions.[10]

SO ORDERED, this __17__ day of July, 2008.


_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

---

[10]  The parties requested in the status report that the date for submitting privilege logs be extended to May 30, 2008.  (Status Report [310] at 9.)  The Court assumes the parties will have exchanged privilege logs by the time this Order is issued.

AO 72A
(Rev.8/82)